UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| **HARVEY STEWART, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Cause No. 1:05-cv-217 |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

### I. INTRODUCTION

Plaintiff Harvey Stewart, Jr., who is *pro se*, seeks judicial review[1] of the final decision of the Defendant Commissioner of Social Security, Jo Anne Barnhart, who found that Stewart was not entitled to Supplemental Security Income ("SSI") or Social Security Disability Insurance Benefits ("DIB").

In short, the Court will not disturb the Administrative Law Judge's ("ALJ") decision to discredit Stewart's alleged limitations. Furthermore, the Court finds that the ALJ properly considered the medical reports of Dr. Zolman, one of Stewart's physicians, and the testimony of the Vocational Expert. Finally, Stewart presents no additional evidence that would require a remand. Therefore, the Commissioner's final decision will be AFFIRMED.

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

### *A. Introduction and Procedural Background*

Stewart filed concurrent claims for DIB and SSI on December 31, 2001, alleging a disability onset date of April 25, 2001.[3] (Tr. 179-82.) After Stewart's application was denied initially and on reconsideration, ALJ Yvonne K. Stam conducted a hearing on August 4, 2003, and rendered an unfavorable opinion on September 7, 2004. (Tr. 16-26, 183-221.) The Appeals Council denied Stewart's request for review. (Tr. 4-6.) Stewart filed here on June 30, 2005, seeking review of the Commissioner's decision, and the matter is now fully briefed.

At the time of the hearing before the ALJ, Stewart was thirty-seven years old and had a high school education. (Tr. 49.) His past employment includes working as a lead housekeeper at a hospital from 1989 until 1999 and as a floor maintenance worker at a grocery store from 1987 until 1989. (Tr. 36 A-F, 44, 64.) He claims he can no longer work due to pain associated with a left shoulder injury and because the medications he takes make him drowsy. (Tr. 199.)

### *B. Medical Evidence*

Stewart's medical records date to November 18, 1997, when he began a series of fifteen physical therapy sessions with Carol Molitor after undergoing surgery on an injured left shoulder. (Tr. 97-98, 102-10, 117.) Upon Stewart's discharge on January 26, 1998, Molitor noted improvement in movement and "overall functional activity level." (Tr. 97.)

---

[2] The administrative record in this case is voluminous (221 pages), and the parties' disputes involve only small portions of it. Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

[3] Stewart previously filed a claim for benefits that was denied by the ALJ on April 24, 2001. (Tr. 19.) The Appeals Council denied his request for review, and the decision was not further appealed, making the April 24, 2001, decision the final decision of the Commissioner. (Tr. 19.)

On January 13, 1999, Stewart began another series of physical therapy sessions with Donna Webster and Mark Fransen after re-injuring his left shoulder. (Tr. 87-96, 99-101.) Progress notes from February 16, 1999, indicate that Stewart's long term and short term treatment goals had been met, with an ongoing treatment goal of decreasing pain to allow return to work. (Tr. 100.) Fransen opined that Stewart's rehabilitation potential was good, recommending that he might benefit from returning to work for four hour shifts with a weight restriction of thirty-five pounds. (Tr. 101.) Since Stewart did not return for any subsequent therapy sessions, he was discharged on March 16, 1999. (Tr. 91.)

Due to recurring pain in his biceps tendon, Stewart underwent arthroscopic surgery on his left shoulder on June 18, 1999. (Tr. 70-72.) Doctor Stephen Wright, the orthopedic surgeon who performed the surgery, opined that Stewart "likely had some biceps tendonitis, but not enough to warrant biceps release and tenodesis," concluding that the majority of Stewart's symptoms were due to chondromalcia and synovitis.[4] (Tr. 70-71.) Dr. Wright recommended range of motion and strengthening exercises. (Tr. 71.)

When Webster performed a functional capacity evaluation on October 25, 1999, Stewart complained of "constant left shoulder pain which increases with activity of the left shoulder." (Tr. 77.) Webster opined that Stewart could perform fine grasping with his left hand continuously and firm grasping frequently, noting that Stewart could use his left hand continuously if he stabilized his left shoulder. (Tr. 76.) Furthermore, she observed that Stewart used only his right arm/hand for the push/pull, carrying, and crawling tasks. (Tr. 76.) Stewart

---

[4] Chondromalacia is the softening of the cartilage, and synovitis is inflammation, "especially that of a joint." *Stedman's Medical Dictionary* 298, 1541 (25th ed. 1990).

was unable to complete the left-sided and bilateral lifting tasks due to left shoulder pain and did not attempt to lift above his left shoulder level. (Tr. 80-81, 83.)

An MRI of Stewart's left shoulder performed on June 29, 2000, revealed abnormalities in one of his tendons that might have represented a partial tear, a small amount of fluid that might have been bursitis, and a small cyst. (Tr. 85-86.)

During October 2000, Stewart again underwent physical therapy for his left shoulder. (Tr. 87-88, 113-16.) Upon his November discharge, he had the same complaints and symptoms as the initial visit, and six out of seven treatment goals were not met. (Tr. 112.)

Stewart visited Doctor Mark Zolman, a physiatrist at Fort Wayne Orthopaedics, on April 2, 2001, complaining of increased left shoulder pain due to an "altercation." (Tr. 147.) Upon examination, Dr. Zolman's impressions were "left shoulder contusion with recent exacerbation" and myofascial pain. He recommended conservative treatment, including medications and home exercises. (Tr. 148.)

During his May 1, 2001, visit with Dr. Zolman, Stewart complained of continued pain. (Tr. 144.) Finding no evidence of joint or ligamentous instability, swelling, or synovitis, Dr. Zolman's impressions were left shoulder contusion, rotator cuff tendinitis, and myofascial pain. (Tr. 145.) To treat Stewart's pain, his shoulder was injected. (Tr. 145.)

Stewart saw Dr. Zolman again on May 14, 2001, reporting that the injection provided only one day of relief. (Tr. 141.) Although Stewart described difficulty when performing activities with his upper left extremity, he also reported slight improvement in his pain. (Tr. 141.) Dr. Zolman recommended continuing with conservative treatment, telling Stewart that he could not "completely explain [Stewart's] symptoms." (Tr. 142.)

During Stewart's July 25, 2001, visit with Dr. Zolman, he indicated that his symptoms were about the same. (Tr. 137.) Dr. Zolman referred Stewart to Doctor Jerald Cooper to explore possible surgical options. (Tr. 138.) On July 30, 2001, Stewart saw Dr. Cooper, who told Stewart he was "very reluctant" to perform another surgery on Stewart's shoulder because he was "suspect" whether it would provide Stewart with relief. (Tr. 134.)

Stewart returned to Dr. Wright on August 30, 2001, complaining of persistent pain that extended from his neck down his entire arm. (Tr. 119, 122.) Stewart reported that one of the medications prescribed by Dr. Zolman helped the pain and the shaking he gets in his arm. (Tr. 119.) Dr. Wright referred Stewart to an anesthesiologist for a stellate ganglion block, which was performed on September 7, 2001. (Tr. 120-22.)

When Stewart saw Dr. Zolman on September 26, 2001, he reported that his symptoms were generally the same and that a recent injection ordered by Dr. Wright did not provide any relief. (Tr. 131.) Dr. Zolman modified Stewart's medication regime and recommended he continue with his daily home exercise program. (Tr. 132.)

Stewart visited Dr. Wright on October 2, 2001, reporting that the sympathetic block "did not help at all, not even for a few hours." (Tr. 119.) Recommending that Stewart continue with his medications and exercises, Dr. Wright informed Stewart that there was nothing surgical he could do. (Tr. 119.) When asked about total disability, Dr. Wright told Stewart to "give it more time." (Tr. 119.)

Stewart scheduled an appointment with Dr. Zolman on November 2, 2001, due to the persistence of his pain symptoms. (Tr. 127.) After discussing Stewart's case with Dr. Wright, Dr. Zolman concluded that there were no surgical options available. (Tr. 137.) He further opined that

5

all conservative treatment options had been exhausted but recommended that Stewart's main treatment program should focus on medications and exercise. (Tr. 137.) When Stewart asked Dr. Zolman about disability, Dr. Zolman replied that he did not believe that Stewart was disabled and recommended vocational rehabilitation. (Tr. 128.)

On February 28, 2002, Stewart visited Dr. Bhupendra Shah, a neurologist, who indicated that a recent MRI of Stewart's cervical spine was negative. (Tr. 166-67.) Dr. Shah increased Stewart's Pamelor medication and recommended using a heating pad or ice pack to his neck and left shoulder twice a day. (Tr. 166.)

On March 27, 2002, a State Agency medical consultant reviewed the evidence of record, opining that Stewart's only limitations were that he could occasionally lift and/or carry twenty pounds, frequently lift and/or carry less than ten pounds, occasionally reach with his left arm, and could not do any repetitive overheard work with his left arm. (Tr. 153-60.) Furthermore, the State Agency physician concluded that Stewart had an unlimited ability to perform fine and gross manipulations. (Tr. 156.)

Stewart returned to Dr. Shah on April 20, 2002, reporting that the Pamelor was helping, although he sometimes felt dizzy, drowsy, and like he was about to pass out. (Tr. 164.) Stewart also complained that he continued to have pain in his left shoulder and that his left hand tingles. (Tr. 164.) Recommending that Stewart take the Pamelor earlier in the evening, Dr. Shah scheduled an EMG and nerve study of Stewart's upper left extremity to determine further courses of treatment. (Tr. 164.) On May 14, 2002, Dr. Shah reported that the tests revealed that Stewart is "essentially within normal limits," finding no evidence of carpal tunnel syndrome or radiculopathy. (Tr. 163.)

During his September 24, 2002, visit with Dr. Shah, Stewart reported that he stopped taking one of his medications, that he experienced pain in his right shoulder and arm, and that he received a cortisone shot from Dr. Wright. (Tr. 169.) Dr. Shah recommended that Stewart continue with all of his medications. (Tr. 169.)

On November 26, 2002, Stewart told Dr. Shah that "he [was] doing fair," reporting that although his pain is "still there," he was now able to sleep well at night. (Tr. 170.) Dr. Shah recommended that Stewart continue with his medications and that he follow-up with Dr. Wright. (Tr. 170.) On January 23, 2003, Stewart reported to Dr. Shah that although he continued to have left shoulder pain, his medications helped. (Tr. 171.)

Stewart saw Dr. Shah again on April 1, 2003, informing Dr. Shah that Dr. Wright advised him to continue with medications and exercise since he did not believe that Stewart needed surgery. (Tr. 172.) Dr. Shah advised Stewart to continue with his medications. (Tr. 172.)

On July 21, 2003, Doctor Stephen Trippel, an orthopedic surgeon, examined Stewart. (Tr. 175.) Concluding that Stewart's symptoms in his left neck, shoulder, and upper extremity region were suggestive of neurological etiology, Dr. Trippel informed Stewart that his problems probably could not be resolved by further surgery. (Tr. 176.) He recommended that Stewart work on recovering function in conjunction with his physicians, possibly by including a focus on pain management. (Tr. 176.)

### C. Administrative Hearing

On August 4, 2003, Stewart testified at an administrative hearing that "a lot of days [he is] in a lot of pain," and that it is hard for him just to get up and "get going." (Tr. 199.) He stated that although his medications make him drowsy, if he does not take them, the pain is more than

7

he can bear. (Tr. 199.) Testifying that he is trying to find doctors to alleviate his symptoms, he stated that Dr. Trippel told him there is no surgery that would help him. (Tr. 206.)

Regarding his limitations, Stewart testified that he now writes with his right hand,[5] relies on his wife to help him get dressed and comb his hair, and relies on his children to help him during the day. (Tr. 204, 207-09.) Furthermore, he stated that he cannot reach farther than arm's length with his left arm, cannot lift any greater than about six pounds with his left arm and fifteen pounds with his right arm, and cannot do chores around the house. (Tr. 207-09, 211, 214.)

Robert Bond, a vocational expert ("VE"), also testified. (Tr. 216-17.) When the ALJ asked the VE what jobs could be performed by a hypothetical individual who has "the residual functioning capacity to perform sedentary work activities that involves no repetitive or overhead activities in the upper left extremity," the VE replied that the individual could not perform Stewart's past work either as he performed it or as it is generally performed in the national economy. (Tr. 216.) He testified, however, that such an individual could work as a callout operator, surveillance monitor, or charge account clerk, stating that this was a "representative" list. (Tr. 216-17.)

Additionally, when the ALJ asked if a hypothetical individual could perform work if he had limitations consistent with Stewart's testimony, the VE answered that the individual could not work due to the pain and the drowsiness caused by medications. (Tr. 217.)

### III. STANDARD OF REVIEW

Section 405(g) of the Social Security Act ("Act") grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing

---

[5] Stewart is left-handed. (Tr. 51.)

8

the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. DISCUSSION

### *A. Legal Framework*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

In determining whether Stewart is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required her to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, see 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] See 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

### B. The ALJ's Decision

In a written decision issued on September 7, 2004, the ALJ determined that Stewart was not disabled. (Tr. 19-25.) The ALJ decided in Stewart's favor on steps one and two, finding that Stewart's left shoulder pain was severe, but also finding that he did not meet a listing at step three. (Tr. 23.) She then ascertained that Stewart had an RFC "to perform most sedentary work activity that involves no repetitive or overhead activities with the upper left extremity," finding that Stewart can "sit six to eight hours per day, can stand and walk six hours of eight in

---

[6] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R. §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

combination for a total of eight hours per day, and can lift and carry up to 10 pounds occasionally and less than ten pounds frequently." (Tr. 24.) Based on this RFC, the ALJ found at step four that Stewart was unable to perform his past relevant work. (Tr. 24.) Relying on the testimony of the VE, the ALJ found at step five that Stewart could perform a "significant number" of jobs in the national economy. (Tr. 25.) Therefore, Stewart was not entitled to SSI or DIB. (Tr. 25.) In reaching this decision, the ALJ found that Stewart's allegations regarding his limitations were "not totally credible." (Tr. 24.)

Stewart conclusorily argues that "the rules for Social Security are not be [sic] followed," but utterly fails to cite any specific legal errors allegedly made by the ALJ.[7] Instead, he uses most of his Opening Brief to reiterate his subjective complaints and limitations, even though the ALJ found the allegations of his limitations not credible. Stewart later argues that Dr. Zolman's medical reports should have been excluded and that the ALJ failed to account for the VE's testimony that a hypothetical individual with Stewart's alleged limitations could not work. He also claims that additional evidence not originally presented to the ALJ should now be considered. These arguments will be discussed in turn.

---

[7] Furthermore, Stewart never articulates why he believes the ALJ's decision was not supported by substantial evidence, instead claiming that "[a]ccording to the rules of disability, I feel that my condition entitles me to receive benefits." (Social Security Opening Br. 1.) He seemingly misconstrues the role of this Court's review, which is generally limited to determining whether the Commissioner's decision is supported by substantial evidence. *See Rohan v. Barnhart*, 306 F. Supp. 2d 756, 770 (N.D. Ill. 2004) (acknowledging that a remand for further proceedings by the Commissioner is generally the appropriate remedy when an ALJ's decision is not supported by substantial evidence).

Indeed, an award of benefits is "essentially a factual finding best left for the [Commissioner] to address in the first instance, unless the record can yield but one supportable conclusion." *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993); *see also Briscoe v. Barnhart*, 524 F.3d 345, 356 (7th Cir. 2005); *Rohan*, 306 F. Supp. 2d at 770; *see generally Burroughs v. Massanari*, 156 F. Supp. 2d 1350, 1367-68 (N.D. Ga. 2001) (articulating that the court may award DIB if "the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability *without any doubt*") (emphasis added). As we shall see, Stewart makes no argument that would lead the Court to believe that the record yields but one supportable conclusion.

### *C. The Court Will Not Disturb the ALJ's Credibility Determination*

Because the ALJ is in the best position to evaluate the credibility of a witness, her determination generally will not be overturned unless it was "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If, however, the reasoning behind the ALJ's credibility determination "does not build an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), this Court must remand because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness." *Carrandine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2000).

Here, Stewart spends most of his Opening Brief reiterating his subjective complaints and limitations, all of which were before the ALJ when she rendered her decision.[8] The ALJ concluded, after considering the evidence, that Stewart's allegations regarding his limitations were not credible. The Court will not upset this finding, since we must not re-weigh the evidence, decide questions of credibility, or substitute our judgment for the Commissioner's. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Indeed, substantial evidence supports the ALJ's credibility finding. Dr. Zolman opined that Stewart was capable of working, and Dr. Wright told Stewart to "give it more time" before filing for disability. Furthermore, the physical therapist's functional capacity report and the State Agency medical consultant's report listed few limitations on Stewart's ability to perform work-

---

[8] Stewart's list of subjective complaints and limitations include the following: 1) He is unable to write with his left hand; 2) He requires help from his family and friends; 3) He cannot dress himself or take a bath; 4) He has a difficult time doing even light house work; 6) Light work makes his condition worse; 7) He cannot drive due to his arm shaking; 8) The six medications he takes only work when he is not doing anything; 8) He experiences swelling and numbness in his left arm and pain his neck; and 9) The pain is so severe that he cannot tolerate it or sleep.

related tasks, mainly limiting Stewart to work that did not involve lifting with his left arm.[9] In addition, both reports indicate that Stewart's fine and gross finger manipulations, even on his left hand, remain intact.

### D. The ALJ Properly Considered the Opinion of Dr. Zolman

Stewart argues that the medical reports from Dr. Zolman were "suppos[ed] to be excluded" from the ALJ's decision because he saw Dr. Zolman only "for a short period of time."[10] (Reply Br. 1-2.) Contrary to Stewart's contentions, the ALJ is *required* to analyze *every* doctor's opinion that is in the record. *See* 20 C.F.R. § 404.1527(d) ("[W]e will evaluate every medical opinion we receive.") In fact, when Stewart requested at the administrative hearing that the ALJ not consider Dr. Zolman's report, the ALJ properly explained that Stewart's objections went to the weight given to the report, not to its admissibility. *See* 20 C.F.R. § 404.1527(d)(3)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more *weight* we will give to the source's medical opinion.") (emphasis added).[11]

---

[9] Stewart argues that he has permanent restrictions because he "cannot raise [his] left arm for proper use." (Opening Brief 1.) He also claims that the doctor who performed his surgeries opined that he will never be able to do physical work again. These limitations were properly accounted for in the ALJ's RFC determination, where she found Stewart capable of performing "most sedentary work activity that involves no repetitive or overhead activities with the upper left extremity." (Tr. 24.)

[10] Dr. Zolman saw Stewart at least seven times over the course of seven months. During the last appointment, Dr. Zolman told Stewart that, in his medical opinion, Stewart was able to work. Stewart, contemptuous of this opinion, argues that it is "not true about my medical condition." (Reply Br. 2.) Stewart, however, fails to explain why this opinion is not supported by substantial evidence already in the record, instead pointing to evidence that was not before the ALJ when she rendered her decision. This additional evidence will be discussed *infra*, Part IV.F.

[11] To the extent Stewart's argument could be construed to mean that the ALJ should not have given great weight to Dr. Zolman's opinion, his argument also fails, since the ALJ also relied on other medical evidence when she found Stewart not disabled. (*See* Tr. 21.) Furthermore, insofar as the ALJ resolved conflicts between Dr. Zolman's report and other medical evidence, this decision is best left to the ALJ. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("When . . . physicians present conflicting evidence, the ALJ may decide whom to

### *E. The ALJ Properly Relied on the VE's Testimony*

Stewart argues that the ALJ failed to take into account the VE's response that a hypothetical individual who had limitations consistent with Stewart's testimony could not work. Stewart, however, misunderstands the progression of hypotheticals posed by the ALJ to the VE and the purpose of that line of questioning. The purpose of the VE is to testify to the job prospects of *hypothetical individuals* with various physical limitations, while expressing no opinions about Stewart's impairments and limitations. The decision regarding Stewart's RFC and the ultimate disability determination are left to the ALJ, who found that Stewart's RFC was encompassed by the limitations expressed in her first hypothetical. *See* 20 C.F.R. § 404.1527(e)(1) (the final responsibility for deciding the claimant's RFC and whether he is disabled is "reserved to the Commissioner"); *Dixon v. Barnhart*, No. 02 C 6410, 2004 WL 603492, at *9 (N.D. Ill. Mar 23, 2004) (citing 20 C.F.R. § 404.1527(e)(1)-(2); *Clifford v. Apfel*, 227 F.3d 863, 872-73 (7th Cir. 2000)) (concluding that the ALJ "is responsible for examining and weighing the evidence of physical limitations and then determining the appropriate RFC determination").

The second hypothetical corresponded to the limitations that Stewart alleged, but the ALJ ultimately found Stewart's allegations not credible. Therefore, the ALJ committed no legal error by not considering the VE's answers to her second hypothetical.

Stewart also argues that "[n]o work in society will be responsible for an injured person who is dangerous to self and others." (Opening Br. 1.) The VE, however, provided a representative list of jobs that an individual who has limitations consistent with the first

---

believe, so long as substantial evidence supports that decision.").

hypothetical could perform, and an ALJ is entitled to rely on this information when rendering her decision. *See McLachlan v. Barnhart*, No. 03 C 2297, 2004 WL 2036294, at *10 (N.D. Ill. Sept. 8, 2004) (quoting *Harris v. Barnhart*, 356 F.3d 926, 931 (8th Cir. 2004)) ("[T]he ALJ was entitled to rely upon the opinion of the vocational expert that there are a significant number of jobs in the economy that [claimant] could perform."). Therefore, the ALJ properly relied on the VE's testimony when she found that Stewart could perform a number of sedentary jobs in the economy.

### F. A Remand for Consideration of Additional Evidence is Not Warranted

Stewart refers to the following evidence he believes the Commissioner should have considered: 1) He is seeing two specialists for depression; 2) He had surgery on his right arm because he used it too much; 3) He suffers from memory loss; 4) He was rejected from vocational rehabilitation; 6) He lacks reading skills; and 5) He is currently seeing Dr. Shah and Dr. Wright. Stewart, however, presented none of this evidence to the ALJ before she rendered her decision. Therefore, Stewart is seemingly asking the Court to remand this matter pursuant to the sixth sentence of 42 U.S.C. § 405(g), which permits a remand "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."

For sixth sentence purposes, "[e]vidence is 'new' if it was 'not in existence or available to the claimant at the time of the administrative proceeding,'" and "evidence is 'material' if there is a 'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered." *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005) (quoting *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997); *Johnson v. Apfel*, 191 F.3d 770,

776 (7th Cir. 1999)). Furthermore, evidence is material "only if it is relevant to the claimant's condition 'during the relevant time period encompassed by the disability application under review.'" *Schmidt*, 395 F.3d at 742 (quoting *Kaputsa v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1990)).

Stewart never explains whether the evidence regarding his rejection from vocational rehabilitation and his problems with depression, his right arm, memory loss, and reading were simply not produced before the ALJ's decision or whether these problems arose afterwards. Thus, it is difficult to ascertain whether any of this evidence is indeed "new." The only claims Stewart makes regarding any of the additional evidence is that not all of the medical evidence was in the "file" and that the medical reports are "not accurate," (Reply Br. 2.), which seemingly indicates that some of the medical records were in existence at the time of the administrative hearing. Thus, to the extent that this additional evidence was already in existence, it cannot be considered "new" evidence. *See Schmidt*, 395 F.3d at 742-43. Furthermore, Stewart makes no claim that the evidence was not "available" to him, offering no explanation "as to why the records were not submitted to the ALJ in time for consideration as part of the record in the administrative proceeding." *Id.* Therefore, the Court cannot remand the case for consideration of this evidence.

Assuming *arguendo* that at least some of this evidence is "new," it still would not meet the criteria for "material" evidence insofar as the evidence relates to conditions that Stewart did not have until after the ALJ rendered her decision. For example, Stewart makes no mention either before or during the hearing of suffering from depression, and his medical records contain no evidence of any diagnosis or treatment for this condition. Thus, Stewart's alleged depression

16

is ostensibly a new medical condition, and any treatment undertaken for depression after the ALJ rendered her decision cannot be considered because it does not "speak[] to [Stewart's] condition as it existed prior to the time of the administrative hearing." *Schmidt*, 395 F.3d at 742 (quoting *Kaputsa*, 900 F.2d at 97) ("[M]edical records 'postdating the hearing' and that 'speak only to [the applicant's] current condition, not to his condition at the time his application was under consideration by the Social Security Administration' do not meet the standard for new and material evidence."). Similarly, Stewart's surgery on his right arm, his memory difficulties, and his rejection from vocational rehabilitation cannot be considered if these problems developed after the ALJ's decision.

Furthermore, even though the records of Stewart's ongoing care with Dr. Wright and Dr. Shah would relate to the "very same elements alleged to constitute [his] disability in the proceedings below as opposed to reflecting an entirely new injury or disabling condition that first developed after the hearing," they still would not meet the "new and material" requirement. *Schmidt*, 395 F.3d at 742. Because the doctors' records would ostensibly reveal the current status of Stewart's left arm and any treatment he underwent since the time of the hearing, they speak only to Stewart's "current condition, not to his condition at the time his application was under consideration" and therefore cannot be considered "new and material." *Id.*; *see also Godsey v. Bowen*, 832 F.2d 443, 445 (7th Cir. 1987) ("The evidence here was immaterial . . . since the fact that her condition had deteriorated by 1986 does not show that in 1983 it was otherwise than found at the administrative hearing.").

Ultimately, it does not matter whether any of the aforementioned evidence is "new and material," because Stewart utterly fails to show "good cause" why the evidence was not

produced during the pendency of the proceedings. Since Stewart offers no explanation for why he did not produce the evidence sooner, the Court cannot remand the case for consideration of this additional evidence. *See* 42 U.S.C. § 405(g) (permitting a remand "only upon a showing . . . that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding").

## V. CONCLUSION

In sum, because the Court cannot decide questions of credibility, we will not upset the ALJ's finding that Stewart's allegations about his limitations were not credible. In addition, the ALJ properly considered Dr. Zolman's medical reports and also properly relied on the VE's testimony when finding that Stewart could perform sedentary work in the economy. Finally, Stewart did not provide "good cause" for why his case should be remanded for consideration of additional evidence. Therefore, the Commissioner's final decision denying Stewart SSI and DIB is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Stewart. SO ORDERED.

Enter for April 10, 2006.

                                                      S/ Roger B. Cosbey
                                                      Roger B. Cosbey
                                                      United States Magistrate Judge